IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                  : CIVIL ACTION
          THOMAS W. OLICK,              :
                    Debtor              : NO. 10cv458
_____        :
THOMAS W. OLICK,                        :
          Plaintiff                     :
                                        :
          vs.                           :
                                        : BANKRUPTCY
JAMES KEARNEY, ET AL.                   :
          Defendants.                   : NO. 07-10880

MEMORANDUM

Thomas W. Olick, debtor, appeals from the bankruptcy court's disposition of two

adversary proceedings (consolidated as Adv. 07-60) that he initiated against his former employer,

the Knights of Columbus ("the Knights"); his former health insurer, the Aetna Life Insurance

Company ("Aetna"); and two individual Knights employees, James Kearney ("Kearney") and

Thomas Jenkins ("Jenkins"). Olick's claims included breach of contract, employment

discrimination and retaliation claims under the Age Discrimination in Employment Act of 1967

("ADEA") and the Pennsylvania Human Relations Act ("PHRA"), and violations of the

Employee Retirement Income Security Act ("ERISA") and the Consolidated Omnibus Budget

Reconciliation Act ("COBRA"). On December 19 and 22, 2008, the bankruptcy court held a trial

on Olick's COBRA claims against the Knights, an ERISA claim against the Knights, and

employment retaliation claims against the Knights and Kearney. On December 28, 2009, the

bankruptcy court entered judgment in favor of Olick on his retaliation and COBRA claims

against the Knights but against him on his other remaining claims. *Olick v. Kearney*, 422 B.R.

507 (Bankr. E.D. Pa. 2009).  Olick appeals from six orders of the Bankruptcy Court in Adversary

Proceeding 07-60.[1]

## I. Brief Factual and Procedural History of Adversary Case No.07-60

In 1995, Olick signed a contract with the Knights to become an insurance salesman in

Pennsylvania. Through his employment, Olick purchased group health insurance for himself, his

wife and children from Aetna. In late 2004 or early 2005, after 10 years of employment, the

relationship with the Knights, and especially Kearney, his supervising general agent, began to

sour. Olick alleges that in 2005, Kearney reduced his sales territory by giving some of Olick's

territory to a younger, less experienced agent, and interfered with Olick's ability to meet his sales

quotas by withholding information from Olick regarding his sales territory and prohibiting Olick

from attending monthly agency meetings.

Olick filed an age discrimination lawsuit against the Knights and Kearney in state court in

February 2006. Shortly thereafter, he received a COBRA Notice informing him that his insurance

benefits had been terminated retroactively to November 1, 2005. Olick amended his complaint adding

Aetna as a defendant. Aetna removed to this court, and Olick again amended his complaint to include his

co-worker Jenkins. Olick then filed a second complaint in this court against defendants Knights,

Kearney, Jenkins, and Aetna. The court consolidated the complaints.

On February 9, 2007, Olick filed for chapter 13 bankruptcy and on February 13, 2007, voluntarily

dismissed the consolidated district court case under Federal Rule of Civil Procedure 41. Olick then

refiled his complaints as adversary proceedings in the bankruptcy court, naming the same four

defendants and reasserting the same claims, several of which had already been dismissed by the district

---

[1]   The certificate of appeal lists a total of twenty-one interlocutory orders that Olick may appeal. Olick has filed an overlong, rambling and in substantial part incomprehensible brief of 182 pages in support of his appeal.

court.

In an order dated June 26, 2007, (Adv. 07-60, Doc. 73) the bankruptcy court determined there were ten claims within the seven asserted counts in the combined adversary complaints.

1- Count I- Age Discrimination & Retaliation against Aetna, the Knights, Kearney, and Jenkins;

2- Count II- "Job Discrimination" against the Knights and Kearney;

3- Count III.A.- COBRA, Sections 502(a)(1)(A) and 606(a)(4) against the Knights and Aetna;

4- Count III.B.- ERISA, Sections 502(a)(1)(B) against the Knights and Aetna;

5- Count III.C.- ERISA, Sections 502(a)(3)(B) against the Knights and Aetna;

6- Count III.D.- ERISA, Sections 502(a)(2)(B) against the Knights and Aetna;

7- Count IV- "Breach of Contract" against the Knights and Kearney;

8- Count V- "Tortious Interference in Business and Contracts" against the Knights, Kearney, and Jenkins;

9- Count VI- "Breach of Contract" against Aetna; and

10- Count VII- "Breach of Contract and Conversion" against the Knights.

The bankruptcy court then dismissed Counts I, III.A, III.D and VI as to Aetna only.  It also dismissed Counts III.B and III.D as to the Knights.[2] After the June 26, 2007 order there were only two claims remaining against Aetna, Counts III.B and III.C.

---

[2]Aetna moved for sanctions against Olick for reasserting claims that were barred by res judicata and, as a result, on October 26, 2007, the bankruptcy court sanctioned Olick $1,000.00 because Olick had asserted three of the same claims against Aetna in the district court litigation and the district court had dismissed those claims with prejudice.

On March 17, 2008, the court issued a bench opinion that granted summary judgment in part[3] and concluded that only the following claims remained.

    1. Count I for retaliation against the Knights, Kearney, and Jenkins
    2. Count III.A. for a COBRA violation against the Knights
    3. Count III.B. under ERISA against Aetna; and
    4. Count III.C. for equitable claims under ERISA against the Knights for failure to convert life insurance.

On May 21, 2008, the bankruptcy court granted the Knights' "Motion to Reconsider in the Nature of a Clarification" to amend the March 17 order so that summary judgment was granted as to Jenkins as to the Count I retaliation claim. Because of a clerical error, however, the order dismissed the claim against Kearney, not Jenkins. As a result, on May 27, 2008, the court amended the order again, so that the Count I retaliation claim was correctly dismissed as to Jenkins, not Kearney.

On April 23, 2008, Aetna submitted an Offer of Judgment under Federal Rule of Bankruptcy Procedure 7068 ("the Offer"), which Olick countersigned on April 26, 2008. The Offer provided that Aetna would "retroactively deem that the member eligibility status for health benefits coverage under the Knights of Columbus health benefits plan ('the Plan') is in place for the period from November 1, 2005 through March 1, 2006" and that the Offer constitutes "full and complete satisfaction of [Olick's] claims against Aetna in this action, including reasonable costs accrued in connection with your claim against Aetna." Olick "unambiguously accepted" the

---

[3] The bankruptcy court granted summary judgment to defendants on the following six claims: Count I- "Age Discrimination" against the Knights, Kearney and Jenkins; Count II- "Job Discrimination"against the Knights and Kearney; Count III.D.- ERISA, Sections 502(a)(2)(B) against the Knights and Aetna; Count IV- "Breach of Contract" against the Knights and Kearney; Count V- "Tortious Interference in Business and Contracts" against the Knights, Kearney, and Jenkins; Count VI- "Breach of Contract" against Aetna; and Count VII-Breach of Contract and Conversion" against the Knights.

Offer on the record in a hearing held on May 21, 2008.[4] Judgment was entered against Aetna on June 3, 2008, in accordance with the Offer, thus resolving all of Olick's claims against Aetna.

Olick and the Knights filed motions to reconsider the summary judgment decision. The bankruptcy court agreed to reconsider dismissal of Olick's age discrimination claim against the Knights and Kearney but ultimately reaffirmed the grant of summary judgment on that claim in an order dated October 2, 2008. As a result only three claims remained for trial:

1- COBRA claim against the Knights;
2- ERISA claim against the Knights; and
3- ADEA, PHRA, and CFEPA[5] retaliation claims against the Knights and Kearney.

After a two-day trial held in December 2008, the bankruptcy court entered final judgment on December 28, 2009, against the Knights on Count I (retaliation) and Count III.A (COBRA), and in favor of defendants as to the remaining claims.

Olick filed a timely notice of appeal on December 31, 2009. Olick appeals from an order dated October 26, 2007 granting Aetna's motion for sanctions against Olick; an order dated March 17, 2008, granting partial summary judgment (and an order dated May 21, 2008 clarifying and amending the March 17 order); an order dated August 12, 2008, awarding Olick costs against Aetna pursuant to the Offer; an order dated October 2, 2008 dismissing Olick's age discrimination claim against the Knights and Kearney; and the final order dated December 28, 2009.

## II. Subject Matter Jurisdiction

---

[4]   Aetna was concerned that the Offer was not legally binding as Olick's acceptance was conditional so it filed a motion to strike "impertinent material" from his acceptance. After a hearing on May 21, 2008, an order dated the same day struck the objectionable material from the record.

[5]   Connecticut Fair Employment Practices Act.

A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees. 28 U.S.C. § 158(a). Appeals to district courts are taken in the same manner as appeals from the district courts to courts of appeals. 28 U.S.C. § 1291; Fed. R. Bank. P. 8001. Pursuant to Federal Rule of Bankruptcy Procedure 8002(a), a party seeking to appeal must file a notice of appeal with the clerk of the bankruptcy court within fourteen days of the date of the entry of the judgment or order from which the party is appealing. Under 28 U.S.C. § 158 (c)(2) and the Federal Rules of Bankruptcy Procedure, an untimely notice of appeal deprives the district court of jurisdiction over the appeal. *In re Caterbone*, No. 06-cv-0512 (3d Cir. 2011).

The Third Circuit has described a final decision as "one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155 (3d Cir. 2004) (citations omitted). Thus, "there is no final order if claims remain unresolved and their resolution is to occur in the district court." *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 557 (3d Cir. 1997). Vitally, "a district court decision dismissing some, but not all, of the claims before the court is not a 'final' order that can be appealed." *N.Y. Football Giants, Inc. v. C.I.R.*, 349 F.3d 102, 106 (3d Cir. 2003). Because bankruptcy proceedings often times include several adversarial proceedings, the finality of an order is determined as to each adversarial proceeding, not the entire bankruptcy. *In re White Beauty View Inc.*, 841 F.2d 524 (3d Cir. 1988).

Olick a timely notice of appeal on December 31, 2009, three days after the final order which disposed of all claims. The notice of appeal is thus timely as to all six orders, and the court

has jurisdiction to hear this appeal.[6]

### III. Standard of Review

A district court reviews a bankruptcy court's "legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Am. Classic Voyages Co., 405 F.3d 127, 130 (3d Cir. 2005)* (quotation and citation omitted); *see* Fed.R.Bankr.P. 8013 ("On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . ."). "A finding of fact is clearly erroneous if a reviewing court has a 'definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer, N.C., 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)). "An abuse of discretion occurs when the court bases its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact." *LaSalle Nat'l Bank v. First Conn. Holding Group, L.L.C. XXIII*, 287 F.3d 279, 288 (3d Cir. 2002). Mixed questions of fact and law require a mixed standard of review, under which the court divides the questions into their respective components and applies the appropriate standard to each. *In re Brown,* 951 F.2d 564, 567 (3d Cir. 1991).

Pursuant to Bankruptcy Rule 8006, an appellant must file with the clerk and serve on the appellee a designation of the items to be included in the record on appeal and a statement of issues to be presented (collectively "designations") within fourteen days after the filing of the

---

[6] All orders prior to the final judgment were interlocutory, and are thus incorporated into the final order for purposes of the appeal.

7

notice of appeal. Appellants have the burden to provide a complete record on appeal. See, e.g., *In re CPDC Inc.,* 221 F.3d 693, 698 (5th Cir. 2000) (explaining that "[t]he burden of creating an adequate record rests with the appellant" because "the purpose of the record designation requirement is to provide the reviewing court with an adequate basis for evaluating the appellant's claims on appeal"); *In Re Corio,* 2008 U.S. Dist. LEXIS 71642 (concluding that appellants took insufficient steps to provide a proper record and therefore court reviewed "the record to the furthest extent possible by relying on the documents listed on appellants' designation of items to be included in the record").

## IV. Discussion

Olick appeals from six orders. Two of the orders pertain to his claim against Aetna: the October 26, 2006 order granting Aetna's motion for sanctions and the August 12, 2008 order determining reasonable costs under the Offer. The remaining four orders pertain to his claims against the other defendants. As explained below, I will affirm all of the bankruptcy court's orders from which Olick appeals.

### A. October 26, 2007 Order Sanctioning Olick (Doc. 167)

On October 26, 2007, the bankruptcy court ordered that Olick be sanctioned $1,000 for reasserting claims against Aetna that had already been dismissed with prejudice by the district court and were thus barred by res judicata. The court explained that pro se litigants are subject to Rule 9011 sanctions and, like attorneys, are judged by an objective standard of reasonableness, which is defined as "an objective knowledge or belief that at the time of the filing of a challenged paper that the claim was well grounded in law and fact." (Adv. 07-60, Doc. 167 p.5 (quoting *In re Kouterick*, 167 B.R. 353, 362 (Bankr. D.. N.J. 1994)).) The court noted that the district court's

8

dismissal with prejudice of the same claim against the same parties clearly barred the reassertion. The court also noted that Olick was quite familiar with the concept of res judicata because he handled at least eight cases pro se where the doctrine was at issue. The bankruptcy court found Olick's excuses for reasserting the claims to be unpersuasive and therefore concluded that Olick violated Fed. R. Bankr. P. 9011.

Olick argues that the court abused its discretion by granting sanctions. Rule 9011 contains a safe harbor provision, which prohibits a party from filing a motion for sanctions "unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Olick argues that Aetna filed a motion for sanctions on April 25, 2007, before sending him a "safe harbor letter" advising him that he had reasserted the barred claims and that he should amend his complaint. According to Olick, Aetna sent the safe harbor letter on April 30, 2007 (although at the hearing he admitted it was sent on March 30, 2007). Olick claims that on May 9.2007, within the safe harbor period, he filed a motion to amend his complaint, which the bankruptcy court denied on June 26, 2007.

In the October 26, 2007 order, the bankruptcy court found that "[a]s required by Fed. R. Bankr. P. 9011(c), Aetna sent a letter dated March 30, 2007 to the Plaintiff of its proposed motion prior to filing the Rule 11 Motion ('the Safe Harbor Letter')." (*Id*. at 1, n.1.) Olick was provided with the twenty-day safe harbor period to correct the problem by amending his complaint. Aetna filed a motion for sanctions on April 25, 2007, after the twenty-one-day period concluded. Olick filed a motion to amend his complaint on May 9, 2007, well outside the safe harbor period. In a hearing on July 27, 2007 regarding the sanctions, Olick agreed that the letter

9

was sent on March 30, not April 30, and that he had in fact received a twenty-four-day safe harbor period. (Adv. 07-60, Doc. 94, 30:3-7.)[7]

Olick argues on appeal (as he did in the hearing) that he did not respond to the letter because he believed that he had received an extension from the court on April 11, 2007 to answer defendant's motions.[8] The April 11, 2007 order granting Olick an extension, however, came before the Rule 9011 motion was even filed and did not apply to motions that were filed after the extension was granted. I will charitably find that Olick's contention is "in error." More importantly, and as the bankruptcy court noted, orders extending time to file answers to motions did not apply to the safe harbor letter, and therefore did not excuse his failure to respond and act within the safe harbor period.

Olick has failed to demonstrate that the bankruptcy court was clearly erroneous in finding that the safe harbor letter was sent on March 30, 2007 and that Olick's motion to amend was filed outside the safe harbor period. The court did not abuse its discretion by granting sanctions, and I will therefore affirm the October 26, 2006 order sanctioning Olick.[9]

_____

[7]   At the hearing, Olick stated that he received the safe-harbor letter "[p]robably five to seven days after March 30th. So, around April 5th, 7th, something like that." (Adv. 07-60, Doc. 94, 30:3-7.) The March 30th letter was admitted into evidence as Exhibit A-1 (but it was not attached to the transcript or to Olick's appellate brief).

[8]   Olick also filed a motion to extend the time to answer the Rule 11 motion on May 9, 2007.

[9]   In a footnote, the bankruptcy court stated that Olick provided several unpersuasive reasons at the hearing as to why he did not respond to the letter in a timely fashion. Olick argued at the hearing that he was unresponsive because he was extremely ill and enduring marital stress at the time. The court reasoned that this was unpersuasive because Olick never went to the hospital or contacted Aetna to inform it that he was too sick to deal with the matter during the safe harbor period. And despite such severe illness, Olick was able to file "a flurry of motions" regarding another issue in the Adversary Matters after the Rule 11 motion was filed. Olick now argues that the court abused its discretion by using Olick's failure to go to the hospital or call Aetna as a

**B. August 12, 2008 Order Awarding Costs (Docs. 317 & 318) against Aetna**

On April 23, 2008, Aetna submitted an Offer of Judgment under Fed. R. Bank. Proc. 7068 ("the Offer"), which Olick countersigned on April 26, 2008. The Offer provided that Aetna would "retroactively deem that the member eligibility status for health benefits coverage under the Knights of Columbus health benefits plan ('the Plan') is in place for the period from November 1, 2005 through March 1, 2006" and that the Offer constitutes "full and complete satisfaction of [Olick's] claims against Aetna in this action, including *reasonable costs* accrued in connection with your claim against Aetna, such amount to be agreed upon by the parties or *determined by the Court's normal procedure for costs* should parties fail to reach such agreement." (Adv. 07-60, Doc. 256 (emphasis added).) Because the parties could not agree as to costs, Olick filed a motion for the court to resolve the matter, listing the costs he sought to recover. The bankruptcy denied most of Olick's requests for costs. Olick argues that the court erred by treating his request for costs under the Offer as a normal submission for costs after a trial on its merits. He argues that Aetna agreed to pay all costs accrued and the court may not deny his specific requests for costs and limit Aetna's obligation under the Offer.

The plain language of the Offer states that costs are to be "determined by the Court's normal procedure for costs." Under Bankruptcy Rule 7054, a bankruptcy court *may* allow costs to a prevailing party; thus, the normal procedure of the bankruptcy court affords courts discretion to determine what constitutes reasonable costs. *In re Gioioso*, 979 F.2d 956, 962 (3d Cir. 1992) ("Bankruptcy Rule 7054(b) permits a bankruptcy court, in its sound exercise of discretion, to award costs to a party prevailing in an adversary proceeding.") The term "reasonable costs" in a

---

basis for imposing sanctions. His claims are completely meritless.

Rule 7068 Offer is a term of art, which references costs listed in 28 U.S.C. § 1920. *In re Philadelphia Mortg. Trust*, 930 F.2d 306, 307 (3d Cir. 1991) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L. Ed. 2d 385 (1987)). Courts in the Third Circuit are thus limited to the types of costs listed in 28 U.S.C. § 1920. The party seeking costs has the burden of proof.

In his motion for costs and subsequently filed surreply, Olick sought the following expenses: federal express and postage, travel expenses for court hearings and depositions, reimbursement for sanctions, PACER fees, state court filing fees, "other/miscellaneous", ERISA penalties, appeal of sanction order fee, photocopying expenses, court reporter fees for eleven depositions, and prejudgment interest. The lower court divided the requested expenses into two categories: (1) expenses that 28 U.S.C. § 1920 expressly prohibits, or Olick failed to establish; and (2) expenses that 28 U.S.C. § 1920 allows, but to which the court applied its discretion.

As to the first category, the bankruptcy court did not commit an error of law or abuse its discretion by denying these costs. First, fees for postage are not a taxable cost listed under 28 U.S.C. § 1920. Although Olick argues that because he was unable to electronically file his documents, and was therefore required to mail all his submissions, (citing to one Eastern District of Arkansas case allowing postage fees), the lower court did not abuse its discretion where there is case law, including in the Eastern District of Pennsylvania, rejecting postage expenses under 28 U.S.C. § 1920. (Adv. 07-60, Doc. 317.) Secondly, Olick's request for travel expenses was denied because such expenses of a *pro se* party are not taxable costs. Olick argues that he was acting as his own attorney and an attorney's travel expenses are taxable costs. But 28 U.S.C. § 1920 allows only for travel costs of witnesses, not the plaintiff or his attorney.

12

The court also denied Olick's PACER fees (without deciding whether viewing documents on PACER is equivalent to coming to the courthouse and copying documents, which is a taxable cost,) because Olick did not document how the $188.96 expense was accrued on PACER or why it was necessary to register for a PACER account when he received paper copies of all papers filed. Olick argues that he was obligated to register for PACER by court order, but does not supply a copy of the court order or documentation establishing his registration and subsequent use of it in accordance with the order. Without proper documentation establishing the expense, the court did not abuse its discretion by rejecting his PACER fees as a taxable cost.

Olick also sought filing fees of his original complaint in state court. The bankruptcy court explained that 28 U.S.C. § 1920 "does not state whether the fees of another court may be taxed if the litigation in the removed court bears a sufficiently close relationship to the case before this court. However, most courts have construed §1920 to preclude the taxing of costs incurred by the prevailing party in state court prior to removal of the action to federal court." (Adv. 07-60, Doc. 317 p. 31-22 (citing *Pershern v. Fiatallis N. Am., Inc.*, 834 F.2d 136, 140 (8th Cir. 1987); *Sigur v. Emerson Process Mgmt.*, 2008 U.S. Dist. LEXIS 106617, 2008 WL 1908590 (M.D. La. Feb. 21, 2008), report and recommendation adopted, 2008 U.S. Dist. LEXIS 35190, 2008 WL 1908588 (M.D. La. Apr. 30, 2008); *Terry v. Allstate Ins. Co.,* 2007 U.S. Dist. LEXIS 81051, 2007 WL 3231716, 2 (E.D. Cal. Nov. 1, 2007)).) Olick does not cite any case law suggesting otherwise. The bankruptcy court did not abuse its discretion in denying this claim.

Lastly, in his surreply and at a hearing for costs, Olick belatedly raised another expense that he wanted to recover: ERISA penalties of $100 per day for 212 days, totaling $21,200. The bankruptcy court denied his "frivolous" request not only because it was made in his surreply,

rather than the motion for costs, but because statutory penalties constitute damages, not costs, and Olick had accepted the Offer of Judgment in complete satisfaction of all damage claims against Aetna. Again, the bankruptcy court neither committed an error of law nor abused its discretion.

As to the second category of expenses, which may be allowed under 28 U.S.C. § 1920 but denied in the lower court's discretion, I find that the court did not abuse its discretion. First, the bankruptcy court denied Olick's request for reimbursement of the sanctions and the cost of his appeal to the district court of the sanctions order finding that because the sanction itself was not a taxable cost, the cost of an appeal of the sanctions order should also be denied. The court also denied Olick's request for prejudgment interest, explaining that prejudgment interest is generally applicable in the damages context, where a party fails to pay a sum of money by a certain date. Olick has not cited any case law allowing prejudgment interest on costs accrued under Rule 7054 (or Rule 54). Again, the bankruptcy court did not abuse its discretion.

The majority of Olick's brief on the issue of costs disputes the court's denial of most of his photocopying and deposition fees. Olick requested over $13,000.00 for the entirety of his costs for photocopies and depositions, of which the court awarded $1,349.50. The court recognized that while discovery regarding when and how Olick was terminated was relevant to Olick's ERISA and COBRA claims against Aetna, Aetna's role in the entire litigation was small as compared to the other defendants. As such, the court concluded that costs should be allocated between Aetna and the other defendants accordingly. As to costs allocated to Aetna, the court found that most of such costs were unproductive and wasteful because Olick refused to accept an

14

Offer of Judgment from Aetna presented on November 29, 2006.[10]

Because Olick's claim against Aetna "was designed primarily to compel Aetna to maintain his health benefits for the finite period of time during which his contractual status and the propriety of the statutory notices of termination of coverage were at issue" and because the November 2006 Offer- with essentially the same terms as the 2008 Offer that Olick ultimately accepted- achieved Olick's goal, the bankruptcy court concluded that Olick got no more in settlement in 2008 than he would have received in 2006. Thus, the court could "find no rational reason why Mr. Olick was unwilling to resolve his differences with Aetna in November 2006." The court therefore concluded that "Mr. Olick's insistence in continuing the litigation against Aetna after November 28, 2006 was unproductive, wasteful and should not be rewarded by the taxation of costs against Aetna." (citing *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d at 468 (in determining taxation of costs, court may consider prevailing party's unclean hands, bad faith, dilatory tactics, or failures to comply with process during course of litigation*); Anderson v. Unum Life Ins. Co. of America*, 2007 U.S. Dist. LEXIS 12492, 2007 WL 604278, at *14 & 16 (M.D. Ala. Feb. 22, 2007) (attorney's fees and costs may be considered excessive based on consideration of results achieved after prevailing party has rejected an offer of judgment under Rule 68). And because Olick had until December 4, 2006 as a reasonable period to accept the November 29, 2006 Offer, the court refused to reimburse costs accrued after December 4, 2006. The court therefore allocated Olick ten percent of costs from three depositions taken prior to

---

[10] The bankruptcy court found that Olick offered no credible explanation as to why he continued the litigation thereafter.

December 4, 2006, and the full photocopying expense of $1,108.25 in that period, as the documents related to Aetna, for a total of $1,349.50.

Olick argues that the court abused its discretion by limiting his costs, which accrued after he rejected Aetna's November 29, 2006 Offer because, according to Olick, that offer was not made in good faith and he had good reason to reject it. First, Olick argues that Aetna refused to answer questions that he had about the Offer, so that he was unable to make an informed decision about whether to accept it. Olick also suggests that the Offer was inadequate and in bad faith because it required him to pay premiums, which he did not believe he was obligated to pay. Moreover, Olick argues that he finally accepted the 2008 Offer because in an oral bench ruling on March 17, 2008 granting partial summary judgment, the bankruptcy court stated that it would not consider statutory damages for Aetna's breach of contract. Because of his poor health and litigation fatigue, Olick agreed to the Offer. According to Olick, it would not have been prudent to accept Aetna's offer in November 2006 prior to taking depositions of Aetna's designated witnesses. And according to Olick, Aetna's witness, Thomas Warzynski, whom he deposed on November 30, 2006, had no firsthand knowledge of Olick's case and therefore Olick argues that he needed to depose more witnesses to determine Aetna's role in the claim. Olick deposed twelve witnesses from December 27, 2006 to January 19, 2007, including Warzynski as well as several employees of the Knights.

Olick concedes that the settlement he received in 2008 was the same as that he would have received in 2006. And although Olick attempts to argue that Aetna's offers were made in bad faith, the November 29, 2006 Offer did not contain any provision requiring that he pay premiums. (Adv. 07-60, Doc. 118, "Exhibits in Support of Motion for Summary Judgment," Ex.

16

65.) And in a letter from Aetna's counsel on November 9, 2006, Olick was informed that "Knights of Columbus's counsel, Mr. Dymek, has advised that Knights of Columbus will agree to make payment on your behalf of the premiums for this period, in order to facilitate your having health coverage for this period." (*Id*.) Elsewhere in the letter, Aetna's counsel clarifies that "[u]nder this proposal, you will get the benefit of not being required to pay for health coverage out of your own pocket for the November 2005 - March 2006 period."[11] (*Id*.)

Although Olick argues that he needed more information to build his claim against Aetna, he does not explain what information he was seeking and in relation to which claim. It appears that Olick was pursuing statutory damages against Aetna. But, as the bankruptcy court noted, Olick's claim for statutory damages against Aetna was dismissed by the district court in September 2006, two months before the 2006 Offer of Judgment. It had been made abundantly clear to Olick by both the district and bankruptcy court that Aetna was not the plan administrator, and thus not liable under ERISA.[12] The bankruptcy court reiterated that Olick would be unable to recover the penalties in the June 2006 order as well as his oral summary judgment order on March 17, 2008. Despite numerous explanations by both the district and bankruptcy court that statutory damages were unavailable against Aetna, Olick continued to pursue his claims. (And despite conceding in his brief that he realized the bankruptcy court would not award him such damages, Olick has again tried to recover the statutory penalties by labeling them as "costs.")

---

[11] This offer letter, dated November 9, 2006, gave Olick until November 15, 2006 to accept. The same terms were included in the November 29, 2006 Offer. (*Id*.)

[12] The November 9, 2006 letter from Aetna's counsel also emphasized that "[a]s we have tried to explain to you on multiple occasions, Aetna is merely the claims administrator for this ERISA plan. Aetna is ***not*** the Plan Administrator." (*Id*.)

Olick's pursuit of penalties against Aetna created unnecessary delay and increased litigation

costs. The bankruptcy court therefore did not abuse its discretion by denying Olick these costs

against Aetna, as well as all of the others previously discussed.[13][14]

### C. March 17, 2008 Order Granting Partial Summary Judgment (Doc. 242) and May 21, 2008 Amendment (Doc. 270)

On March 17, 2008, the bankruptcy court issued an oral bench ruling granting summary

judgment in part. (Adv. 07-60, Docs. 240-41.) Although a written order was filed that day, it

does not include the reasoning or analysis for the court's conclusions stated orally in court. (*Id*.,

Doc. 242.) In his appellate brief, Olick concedes that "[t]he lower court did not issue a written

opinion on 3/17/08 and none was obtained. As a bankrupt litigant, Appellant cannot afford to

purchase it." (Appellant's Brief p. 141.) Because Olick has not provided relevant portions of the

transcript of the March 17 hearing in which the court enumerated its analysis of the summary

judgment motions, I am unable to conduct a meaningful review of the order and will therefore

affirm the summary judgment order.

Appellants have the duty to provide the court with all documents, including transcripts,

that are necessary to conduct a substantive review. Fed. R. Bankr. P. 8006. Rule 8006 explicitly

requires appellant to make arrangements to order and pay for transcripts. Rule 8001 allows for

dismissal of a bankruptcy appeal where appellant fails to perform a necessary step in completing

---

[13] Although the bankruptcy court denied Olick's costs as to Aetna, the majority of costs were allocated to the Knights. Because Olick succeeded in his COBRA and ADEA retaliation claims against the Knights at trial, the court noted in its post-trial findings of fact and conclusions of law that Olick would be awarded costs, which are likely to be substantial. (Doc. 393, p. 41 n.38.)

[14] The bankruptcy court held a hearing on the issue of costs and issued a thirty-three page opinion which carefully analyzed and considered each of the claims in detail.

the record. This is appropriate where the order being appealed from does not disclose the factual

or legal basis of the bankruptcy judge's decision because the court may not "conduct a

meaningful review of the issue without reviewing the transcript." *In re Corio*, No. 07-5864, 2008

U.S. Dist. LEXIS 71642 (D. N.J. Sept. 22, 2008) (dismissing appeal where appellant failed to

provide transcript of oral ruling). *See also Hall v. Galie*, 354 Fed. App'x 715 (3d Cir. 2009)

(affirming district court's denial of appellants appeal where appellant failed to provide transcript

of trial, which included oral rulings of motions made at trial, and where appellant's brief

summarily argued that defendants should be liable and did not identify the court's alleged errors);

*Melton v. City of Philadelphia*, 344 Fed. App'x 806 (3d Cir. 2009) (affirming district court's

denial of appeal and recognizing no "meaningful review of claim" possible where rulings made

during trial not in record and no transcript provided) (non-precedential); *McGinnis Gustafson*,

978 F.2d 1199 (10th  Cir. 1992) (denying appeal of summary judgment because appellant's

failure to provide transcript of judge's oral ruling "raises an effective barrier to informed,

substantive appellate review"); *In re Dockal*, No. SA-05-CA-472-B, 2005 U.S. Dist. LEXIS

(W.D. Tex. Sept. 6, 2005) (denying appeal under Bankruptcy Rules where appellant failed to

provide the transcript explaining the factual and legal basis of the judge's order). Without the

court's reasoning, I am unable to conduct a meaningful review of Olick's appeal as to this

order.[15]

     As to the May 21, 2008 amendment of the order, Olick argues that it incorrectly

dismissed his ADEA retaliation claim against Kearney, rather than Jenkins. But in an order dated

---

[15]   I certainly cannot rely solely on Olick's summary of the bankruptcy court's reasoning,
especially where Olick has several times misrepresented and mischaracterized the court's
findings and conclusions as well as the evidence in the record.

May 27, 2008, which Olick neglects to acknowledge in his brief, the lower court corrected the

clerical error and properly dismissed the claim against Jenkins. The retaliation claim survived as

to the Knights and Kearney and therefore remained as one of the three claims heard at trial.

### D. 10/2/08 Order Granting the Knights' and Kearney's Motion for Summary Judgment (Doc. 333) as to Olick's Age Discrimination Claims

In an order dated June 3, 2008, the bankruptcy court granted Olick's motion to reconsider

the March 17, 2008 order granting partial summary judgment as to the age discrimination claim

against the Knights and Kearney. In his oral summary judgment ruling on March 17, 2008, the

bankruptcy court concluded that the seven-year age difference between Olick and Jenkins was

not sufficient to establish a prima facie case of discriminatory termination under the ADEA.

Because the bankruptcy court later found that the age difference was actually eight and a half

years, rather than seven, it then agreed to reconsider the claim. The court reaffirmed the summary

judgment order on October 2, 2008, however, because although Olick was able to establish a

prima facie case of age discrimination under the ADEA, he did not proffer evidence

demonstrating the existence of a genuine issue of material fact as to whether defendants'

proffered reason for his termination was pretextual. I affirm the bankruptcy court's assessment.

A grant of summary judgments is reviewed de novo, using the same standard applied by

the bankruptcy court. *Alcoa, Inc. v. United States*, 509 F.3d 1224, 1231 (3d Cir. 1994). A motion

for summary judgment will be granted only "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence

exists from which a rational person could conclude that the position of the person with the

burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90

F.3d 737, 743 (3d Cir. 1996). "Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v.*

*Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

> The moving party bears the initial burden of showing that there is no genuine issue of

material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once the moving party has met its initial burden, the nonmoving party must present

"specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587

(internal quotation marks omitted), offering concrete evidence supporting each essential element

of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he

mere existence of a scintilla of evidence" for elements on which it bears the burden of

production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely

upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676

F.2d 965, 969 (3d Cir. 1982). Where the nonmoving party has the burden of persuasion,

summary judgment will be entered if the nonmoving party fails to establish a genuine issue of

material fact as to the existence of an element necessary to its case. *Celotex*, 477 U.S. at 322.

> When a court evaluates a motion for summary judgment, "[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a

disagreement over what inferences can be reasonably drawn from the facts even if the facts are

undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (internal quotation marks and citations omitted).

"[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

The issue at summary judgment was whether defendants' proffered reason for reducing Olick's sales territories and then terminating him was pretextual. According to Olick, the bankruptcy court erred by failing to "render a negative connotation for the Knights" despite recognizing that defendants' exhibits were "'deeply flawed.'" He argues that it was defendants' obligation to provide evidence that his pre-2005 production was poor. Olick also argues that the court failed to consider whether defendants discriminated against Olick by reducing his sales territories to prevent him from selling insurance policies as a way of creating pretext for his termination.

Olick misunderstand the parties' burdens at each stage of the McDonnell-Douglas burden-shifting framework. The bankruptcy court found that Olick stated a prima face case of age discrimination, so the burden *of production* shifted to defendants. Defendants articulated a legitimate reason for reducing his sales territories and ultimately firing him. According to defendants, Olick's sales performance was poor. In support of this contention, defendants submitted the following: (1) affidavit of Thomas Smith, Vice President of Agencies, stating that Olick's performance was "substandard" (Adv. 07-60, "Exhibits in Support of Motion for Summary Judgment," Ex. 2 & Ex. 29); (2) five letters from Olick to the Knights between 2000 and January 31, 2005 explaining why, despite his failure to meet sales standards, his benefits should not be reduced (*Id*., Ex. 30); (3) the "Field Agents Recorded Business Report Year-to-Date as of 12-31-05" ranking Olick 1,181 out of 1,237 agents (*Id*., Ex. 32); (5) a "Council

22

Addition or Deletion" form dated May 1, 2005, which states that Olick's territory was decreased "due to unacceptable production from agent T. Olick" (*Id.*, Ex. 44) ; and (6) the September 8, 2006 Notice of Intent to Terminate sent to Olick, which states that "Agent Tom Olick has failed to produce an acceptable volume of business to justify continuance of his contract." (*Id.*, Ex. 48).

The bankruptcy court noted that defendants did not present evidence regarding the performance standards that they use or the sales data for their field agents for the period prior to September 8, 2005, when Olick received the Notice of Intent to Terminate. The court also recognized that the 2005 report was of limited utility because it post-dates the Notice of Intent to Terminate so that data in that report of sales from September to December of 2005 could not have played a role in deciding to reduce his territory and terminate Olick. The court concluded that the report's probative value was limited by defendants' failure to provide an affidavit explaining key terms used in the report, such as "net premium" gross value, "equalizer", etc., and how that information was used to determine performance and rank. But, as the court recognized defendants were not obligated to present evidence establishing that they were motivated by Olick's poor performance at that stage. Defendants satisfied their burden of production by articulating a legitimate reason for their actions.

It was Olick's burden to establish a genuine issue of material facts as to whether defendant's proffered reason was pretextual at step three of the McDonnell-Douglas framework. "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id*. (internal citations and quotations omitted).

Olick failed to demonstrate inconsistencies in the Knights' proffered reason such that a reasonable fact-finder could rationally find that it is unworthy of credence. In multiple submissions to the court prior to summary judgment,[16] Olick argued that he ranked within the top third of all agents in prior years. In support of that statement, Olick cited to the following: (1) Field Agents Recorded Business Report Year-to-Date as of February 1996 (Doc. 320, Ex. 21); (2) Field Agents Recorded Business Report Year-to-Date as of December 2001, in which Olick was ranked 461st out of 1126 agents (*Id*., Ex. 4); (3) Field Agents Recorded Business Report Year-to-Date as of February 2003 in which Olick was ranked 4th (*Id*., Ex. 3); (5) Olick's Progress Report as of December 2003 (Doc. 157, Ex. 12); and (6) Olick's Progress Report as of December 2004 (Doc. 320, Ex. 22.).

---

[16] Olick had several opportunities to argue his age discrimination claims before the motion to reconsider his age discrimination claim in his (1) brief in opposition to summary judgment (Doc. 157); (2) surreply in opposition to summary judgment (Doc. 186); and (3) supplemental brief in support of an inference of age discrimination (Doc. 320).

Olick's exhibits are insufficient for several reasons. First, like defendants, Olick failed to explain what performance standards are used. According to Olick, minimum production required from an agent is $15,000 in Equalizer. (Adv. 07-60, Doc 157 "Plaintiff's Answer and Brief in Opposition to Motion for Summary Judgment" p. 13.) Olick cites a 2004 Knights document discussing "minimum production requirements to maintain Full-Time Benefits Status," which states that "$15,000 Equalizer, as well as a minimum of fifty life sales to members is required in the first full calendar year and subsequent years in order to maintain Full-Benefit Status." (Id., Ex. 14.) But Olick does not explain why that is the relevant standard where agents are also given individual quotas to meet, as seen on the Field Agents Reports.

Also, Olick did not provide definitions for the terms used in the Field Agents Reports and Progress Reports or any explanation regarding the data contained in Field Agents Reports, which appear to rank all agents, and Progress Reports, which appears to list data about an individual agent's performance. Without such foundational information, a fact-finder cannot interpret the data contained in these reports to determine whether they create pretext. Moreover, the 1996 and 2003 Field Agent Reports reflect Olick's performance as of February of those years and, therefore, do not provide any meaningful information regarding his performance for that year.

Facially, the exhibits do not support Olick's various allegations regarding his performance. For instance, Olick claims that in 2004, he produced approximately 50 applications and $16,447 in Equalizer. The 2004 Progress Report, however, lists Equalizer at $13,360 and states that Olick is below the year to date quota by $14,419. (Doc. 320, Ex. 22.) Without further explanation to assist in interpreting the data in the reports, the reports do not support Olick's claim that he was ranked within the top third of all agents during his employment with the

Knights. Olick failed to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Knights' proffered reason for his termination that a reasonable fact-finder could find the reason articulated by the defendants to be unworthy of belief.

Olick also failed to establish that invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Fuentes*, 32 F.3d 759, Olick argues that the 2005 Field Agents Report provided by the Knights shows that less than 10% of agents met their quotas in 2005. According to Olick, because defendants did not produce evidence that those agents were also terminated due to poor production, he was treated differently. It was Olick's burden, however, to demonstrate that the other similarly situated agents were treated differently. Olick presented no evidence regarding the ages of the other agents or any information regarding whether those agents were ever terminated or had their territories reduced as a result of their performance. Olick therefore did not establish that a reasonable jury could determine that the Knights and Kearney were liable under the ADEA.[17]

---

[17]   Olick now argues that testimony and evidence at trial establishes a genuine issue of fact as to pretext. But "an appellate court may only review the record as it existed at the time summary judgment was entered. In reviewing a summary judgment order, an appellate court can consider only those papers that were before the trial court." *Union Pac. R.R. Co. v. Greentree Transp. Trucking Co.*, 29 F.3d 120, 126 (3d Cir. 2002).Thus, I may not consider trial testimony and documentary evidence in reviewing the summary judgment order. Evidence at trial may be relevant, however, insofar as Olick is also appealing the denial of his post-trial motion to reconsider (Doc. 397), in which Olick sought reconsideration of various claims, including his age discrimination claim, which was denied January 10, 2010 (Doc. 411). Olick now argues that Kearney's testimony at trial establishes Olick was "average" and did not have insufficient production, as defendants alleged during summary judgment, therefore creating a genuine issue of pretext. Reconsideration under Bankruptcy Rule 9024, which applies the standard under Rule of Civil Procedure 60, is proper where a party establishes that there was a manifest error of law or that new evidence has emerged. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to

Lastly, Olick argues that the bankruptcy court failed to address whether Kearney's actions in reducing Olick's sales territories and forbidding him from attending the monthly meetings were themselves discriminatory acts designed to prevent Olick from reaching his production quotas so as to create pretext for ultimately terminating Olick. The bankruptcy court explicitly addressed this claim, concluding that because defendants offered a legitimate reason for reducing the sales territories, namely poor performance, Olick had the burden of demonstrating that the defendants' proffered reason was pretextual. As explained above, Olick did not present evidence sufficient for a reasonable fact-finder to find that defendant's claims regarding his performance were pretextual.

Because the evidence at summary judgment was insufficient to establish a genuine issue of material fact as to Olick's performance, which would allow a reasonable fact-finder to find pretext, I will affirm the summary judgment order as to the age discrimination claim.

**E. Final Judgment (Doc. 393)**

During a two-day bench trial, the bankruptcy court dealt with Olick's remaining three claims against the Knights:  1) a COBRA claim for failure to give Olick the statutorily required notice to elect continuation of health coverage, 2) an equitable ERISA claim for depriving Olick of the opportunity to convert his group life insurance policy to an individual policy, and 3) an ADEA retaliation claim for terminating Olick and backdating his COBRA notice. After trial the bankruptcy court filed a seventy-one page document making findings of fact and conclusions of

---

present newly discovered evidence." Olick has not demonstrated that the bankruptcy court made any manifest error of law or that new evidence emerged at trial demonstrating that he was terminated or otherwise treated differently because of his age. I will therefore also affirm the denial of his motion to reconsider as to the age discrimination claim.

law which consisted of an extensive discussion of the testimony during the trial and a thorough explanation of its decision.

Most testimony and evidence offered at trial was presented to resolve a central disputed question: when and how was Olick terminated? James Lee ("Lee"), Director of the Agency Department for the Knights, testified that Olick resigned in November 2005, while Kearney, Olick's supervising general agent, testified that he intended to terminate Olick January 1, 2006. Despite contradictory and internally inconsistent testimony by their witnesses, defendants maintained that Olick resigned on November 1, 2005. Olick testified that he received a COBRA notice dated February 28, 2006, but never received any valid notice of termination. The bankruptcy court found that Olick did not resign on November 5, 2005, as Lee alleged, but was terminated on February 28, 2006, when a termination form and an improperly backdated COBRA notice were mailed to him.

The bankruptcy court concluded that (1) defendants violated COBRA, thus exercising its discretion under 29 U.S.C. section 1132(c) and awarded Olick $13,200 in damages; (2) that the defendants did not violate ERISA because Olick was provided with a "Summary of Coverage" booklet when he was first hired by the Knights in 1995, which advised Olick of his rights of conversion; and that (3) defendants violated the ADEA by backdating his COBRA notice in retaliation for his ADEA complaint filed in federal court, thus awarding Olick additional damages of $1,797.83.

28

Olick now argues that the bankruptcy court made various factual errors and erred by limiting the COBRA damages as well as by concluding that there was no ERISA violation and no retaliatory termination under the ADEA other than the backdating of his COBRA notice.[18]

### 1. COBRA Claim

Olick received  a COBRA notice dated February 28, 2006, which notified him of his right to elect health coverage. According to the COBRA notice, the qualifying event date, which reflects the date on which Olick's health coverage would end if he chose not to elect COBRA coverage, was backdated to November 1, 2005, resulting in cancellation and loss of health coverage for a period of four months that Olick had paid and received. The bankruptcy court found that a potential four month gap in health coverage is material information affecting an employee's decision whether to elect coverage. The bankruptcy court concluded that the intentionally backdated COBRA notice violated 29 U.S.C. section 1132(c) and therefore assessed maximum statutory per diem damages of $110 from November 5, 2005- the incorrect date listed on the COBRA Notice- to February 28, 2006- the correct date of the qualifying event.

Olick argues that he never received a valid COBRA Notice, and that he should therefore have been awarded statutory per diem damages for a period of twenty four months as permitted by Section 4980B of the Internal Revenue Code. The I.R.C. imposes an excise tax on plan administrators for failure to comply with COBRA, while ERISA grants individuals the right to bring suit and provides for penalties against plan administrators violating COBRA. 29 U.S.C.

---

[18] Olick again argues that he was discriminated against because of his age in violation of the ADEA and that Kearney interfered with his business so as to prevent Olick from meeting production standards, thus creating a pretext for his termination. Olick's ADEA discrimination claim was not a claim at trial, however, as it was disposed of by summary judgment and again after his motion to reconsider. I will therefore not consider these arguments here.

section 1132(c) provides the court with discretion in determining the amount of the per diem

award, with a maximum set at $110 per day, as well the as the period of time for which per diem

damages are awarded. The bankruptcy court properly exercised its discretion in awarding Olick

damages for the period of November 5, 2005 to February 28, 2006. The court noted that Olick

had already been compensated for the actual damages that he suffered resulting from the

backdating of the qualifying event through settlement with Aetna and that the Knights would be

responsible for Olick's costs, which are substantial.

Olick also argues that the bankruptcy court failed to award any damages for the Knights'

failure to provide Olick with the information that he requested and needed to dispute the date of

the qualifying event. Under § 1132(c)(1)(B), a plan administrator "who fails or refuses to comply

with a request for any information which such administrator is required by this subchapter to

furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to

such participant or beneficiary in the amount of up to $100 a day from the date of such failure or

refusal, and the court may in its discretion order such other relief as it deems proper." Section

1024 provides that "[t]he administrator shall, upon written request of any participant or

beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual

report, any terminal report, the bargaining agreement, trust agreement, contract, or other

instruments under which the plan is established or operated." Olick has not alleged that he

requested from the Knights, as plan administrator, documents that the Knights were required to

provide under section § 1024(b)(4) .[19]  The bankruptcy court therefore did not err by not

awarding him damages under 1132(c)(1)(B).

### 2. Equitable ERISA claim

At trial, Olick testified that he did not receive any information regarding his right to

convert his group life insurance policy to an individual policy until after he filed his suit, when he

obtained a copy of his Summary of Coverage from Aetna during discovery, dated January 1,

2003. He therefore sought equitable relief under 29 USC § 1132 (a)(3)(b) for loss of the

opportunity to exercise his conversion rights. Lee testified, however, that the Knights' regular

procedure was to send a fringe benefits package to newly hired field agents, which includes a

booklet from the group life insurance carrier. The bankruptcy court found that Olick received a

fringe benefits package, including the group life insurance booklet, when he began working with

the Knights in 1995. Moreover, the court found that because of Olick's experience as a life

insurance agent, he was likely aware of his right to convert the policy.

Olick now argues that the bankruptcy court erred by finding that the Knights followed

standard protocol when he was first hired in 1995. According to Olick, defendants presented no

---

[19]  A written request for documents under § 1024(b)(4) implicates the penalty provision of §
1132(c)(1) only if the request gives the administrator "clear notice" of exactly what information
is sought. The Third Circuit has stated that "we should look to whether 'either the request or the
response indicates that [defendant] knew or should have known that [plaintiff] had requested a
copy of any document relating to the . . . [p]lan.'" *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139,
145 (3d Cir. 2007) (quoting Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1077 (5th Cir. 1990)).
Olick alleged in his complaint that he "filed telephone and written appeals of Aetna on 3/11/06,
3/13/06, 5/1/06 and 5/12/06. The Plaintiff also filed a telephone appeal with the Knights
regarding the aforementioned adverse eligibility determinations made on his health insurance
claims. Both Aetna and the Knights ignored the Plaintiff's appeals and requests for information
regarding their adverse determinations." (Adv, 07-60, Doc. 1 Par 127-129.) Olick has not alleged
in his complaint or brief, however, that he has requested from the Knights, as plan administrator,
documents relating to the plan listed in § 1024(b)(4).

evidence that any insurance information was ever mailed or handed to Olick in 1995 and

defendants produced no copy of the fringe benefits booklet as it existed in 1995, instead relying

on the 2003 Summary of Coverage. Moreover, Olick argues that he has no experience selling

group life insurance plans and therefore did not have independent knowledge of his conversion

rights.

The bankruptcy court's finding was not clearly erroneous. "[W]hen a trial judge's finding

is based on his decision to credit the testimony of one of two or more witnesses, each of whom

has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that

finding, if not internally inconsistent, can virtually never be clear error." *EBC, Inc. v. Clark Bldg.*

*Sys.*, 618 F.3d 253, 273 (3d Cir. 2010). As the bankruptcy judge noted, evidence on this claim

was meager. The court found that Olick was not credible on this issue and found that there is "no

reason to believe that the Knights did not follow standard procedure in Olick's case at the time

his employment commenced" and therefore credited Lee's testimony on this matter. While Olick

presented a lot of evidence regarding the Knights' failure to follow standard procedure during his

termination, he presented no evidence at all to suggest procedure was not followed at the

commencement of his employment.

Equally as important, the bankruptcy court noted that Olick did not claim that the Knights

prevented him from converting his policy, but only that defendants did not provide him with an

opportunity to do so. Because Olick did not establish that he was actually harmed by this alleged

failure, the court concluded "that it is not appropriate to exercise the equitable powers of the

court to fashion a remedy in Olick's favor." *See e.g.*, *Brown v. Aventis Pharmaceuticals, Inc.*,

341 F.3d 822 (8th Cir. 2003) (affirming equitable relief where defendant-employer ignored

plaintiff's request for information regarding group life insurance conversion rights after she was terminated and denied her untimely application to convert her life insurance because defendant prevented plaintiff from exercising her conversion rights). I therefore find that the court did not make any clearly erroneous factual findings and did not abuse its discretion by refusing to grant Olick equitable relief under 29 USC § 1132 (a)(3)(b).

### 3. Retaliation Claim under the ADEA

The bankruptcy court made the following factual findings. In late 2004 or early 2005, the relationship between Olick and Kearney soured. As early as February 2005, Kearney verbally informed Olick that the majority of his territory was being reassigned to newly hired agent Jenkins. Kearney also informed Olick that he should no longer attend the monthly meetings and reduced his sales territory membership.[20] On September 8, 2005, Kearney sent Olick a Notice of Intent to Terminate, which Olick received within a week.[21] The Notice of Intent serves as a warning and does not effect a termination. The court found that upon sending the Notice of Intent, Kearney believed that Olick's termination was inevitable. After receipt of the Notice of Intent, Olick applied to other insurance agencies and contacted the Allentown UC Services Center to apply for unemployment compensation. The Center then contacted the Knights for information regarding Olick's employment status to which the Knights responded by letter twice November 10, 2005 and January 10, 2006, that Olick was an active field agent. Despite the

---

[20]  Olick disputes certain dates as to when Kearney began interfering with his ability to sell and how many members he reduced his territory by. As will be discussed, these specifics are not relevant to the retaliation claim.

[21]  The Notice states that Olick "has failed to produce an acceptable volume of business to justify continuance of his contract."

application for unemployment compensation, Olick wrote several insurance policies for the
Knights after receiving the Notice of Intent to Terminate.

The court found that in early January 2006, Kearney mailed a Termination Form dated
January 1, 2006 to the Agency Department to begin the process to terminate Olick, but the
Agency Department never received the form and therefore never effectuated the termination.[22]  In
February 2006, Olick filed his first suit against the defendants in state court. The Knights were
served on February 15, 2006. After learning of the suit, Lee checked Olick's personnel file and
found no record of termination. On February 16, Lee called Kearney to discuss Olick's
termination and requested that Kearney prepare a Termination Form. Kearney faxed Lee a
termination form dated January 1, 2006, stating that Olick was terminated because of insufficient
production effective January 1, 2006. Lee then contacted Bob O'Keefe, Kearney's supervisor,
because he was concerned about the January 1, 2006 termination date. On February 17, Lee,
Kearney, and O'Keefe had a conference call, after which Lee decided to use the termination date

---

[22]  The termination process requires that the general agent complete a Termination Notice, send
four copies to the Agency Department, where it is to be time-stamped, where Thomas Smith,
Vice President of Agencies, reviews and signs the form. Smith's signature is not essential to
processing the termination, however. An inter-office memorandum is generated advising the
various departments of the agent's termination and copies of the termination form are distributed
so that one is placed in the employee's file, two are mailed to the general agent, and another copy
is mailed directly to the terminated field agent. The Agency Department also generates and sends
the COBRA notice.

of November 1, 2005.[23] Lee therefore requested that Kearney send a second termination form

dated November 1, 2005, which Kearney faxed that day.

There was then a series of email correspondences between Lee, Kearney, O'Keefe and

several other Knights employees regarding Olick's termination date. On February 17, O'Keefe

sent Kearney an email requesting an explanation of the circumstances leading up to Olick's

termination and asking specifically

> If he was, as you said yesterday, gone Nov. 1, why did you wait till January to terminate him?
> How should we interpret your January 1 termination if he was gone in November? Was it not
>      truthful?
> What do you think will happen when Olick received a copy of the termination effective Nov.
>      1 which is sent out from here Feb. 17?

On February 22, Kearney replied to O'Keefe's email stating that

> [1] I did not say Olick was gone Nov. 1st, Jim Lee informed me during our conversation
> that Olick resigned Nov. 1st, which I have no documentation on that statement. [2] I
> terminated Olick Jan 1st.2006 [sic] as not to have any low producers od his nature into
> 2006.
> Meanwhile, Lee forwarded the second termination form, dated November 1, 2005, to

Smith, Vice President of Agencies, who then handwrote an undated memo to Lee, O'Keefe, and

---

[23]  Lee did not give a consistent, plausible explanation for selecting November 1, 2005 as
Olick;s termination date. Lee testified that he chose the date because it was in Olick's best
interest as it allowed for Olick to be refunded any premiums he paid for insurance from
November to February. He also testified that Olick called him in February 2006 complaining that
he had resigned in November 2005 but was still paying for insurance. Olick testified that he did
not call until March 15, 2006. The court credited Olick's testimony on this matter.
     Lee then testified that Kearney informed him that Olick resigned during the conference
call. But in an email to Bob O'Keefe following their conference call, and again at trial, Kearney
denied making that statement, instead alleging that Lee informed him that Olick resigned. The
bankruptcy court therefore found that neither Kearney nor Olick ever informed Lee that Olick
resigned on November 1, 2005.

Mike Paradis, another Vice President in the Agency Department, asking for a full and complete explanation of the situation. Lee never responded. Smith never signed the termination form.

Also, after seeing Kearney's February 22 email response to O'Keefe, Lee drafted a memo to Olick's file, dated February 28, stating

> I reviewed the email from Jim Kearney in regards to the above name. I wish to point out that Jim did admit that Thomas had resigned on November 1, 2005. Bob O'Keefe was a party to this conference call and agreed that Jim did admit that his agent resigned on November 1, 2005.

On February 28, 2006, the Agency department circulated an inter-office memo advising that Olick had been terminated effective November 1, 2005. The Knights mailed the second termination form as well as a COBRA notice to Olick that day.

Based on these factual findings, the bankruptcy court concluded that although plaintiff engaged in protected activity by filing a discrimination suit and termination constitutes an adverse action, Olick did not establish a prima facie case of retaliation because there was no causal connection between the filing and his termination. The court explained that "Olick's termination was inevitable once Kearney issued the Notice of Intent to Terminate Olick in September 2005. Kearney followed up on this intent by attempting (unsuccessfully) to initiate the termination process in January 2006. The inevitability of the termination severs the causal connection between Olick's protected activity and his ultimate termination on February 28, 2006." (citations omitted). The court concluded, however, that defendant's back-dating of Olick's COBRA notice was in fact retaliatory.

Olick argues that the court's conclusion that his termination was inevitable and therefore not retaliatory is based on several erroneous of findings. First, Olick argues that Kearney's

36

interference with his sales territory throughout 2005, the Notice of Intent to Terminate, and his

ultimate termination were acts of retaliation in response to Olick's complaints to the Knights of

unfair treatment by Kearney. In a letter dated June 6, 2005, Olick complained of his reduced

territory, stating that "[i]f it has been determined that I should be fired, so be it. Mr. Kearney's

actions have made this readily apparent." (Plaintiff's Selected Trial Exhibits Binder, Ex. __) And

in a letter dated October 3, 2005, Olick again complained that

> [a]s an at will employee, the Knights of Columbus are free to fire me. However, I
> feel that I have been grossly abused by the above mentioned actions. There was no
> reasonable basis for my supervisor, Kearney, to make it impossible to submit
> business and refuse to fire me at the same time."

(*Id*.)The letters did not explicitly or implicitly state that Olick believed age to be the reason for

Kearney's actions. "A general complaint of unfair treatment does not translate into a charge of

illegal age discrimination" and cannot therefore constitute protected activity. *Barber v. CSX*

*Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).

Next, Olick argues that testimony and evidence at trial established that Lee, not Kearney,

terminated Olick in February 2006. Olick argues that after learning of the suit, Lee decided to

terminate Olick and contacted Kearney to obtain a Notice of Termination. Olick argues that

because Lee had no knowledge of the Notice of Intent to Terminate sent to Olick in September

because there was no copy in his personnel file, Lee's decision could not have been predicated on

that. Lee did not time-stamp the January 1, 2006 or November 1, 2005 termination notices that

Kearney faxed him and never obtained Smith's signature to complete the termination process.

According to Olick, that is why Lee did not send him any termination notices but mailed only a

backdated COBRA notice. Olick further argues that Kearney never produced the original copy of

the January 1, 2006 termination notice that he allegedly sent to the Agency Department in January 2006 because it doesn't exist; rather, according to Olick, Kearney did not intend to fire him in January and only generated the termination notice at Lee's request. Moreover, Olick argues that January and February sales reports continued to list Olick as an agent and reflected new changes to his sales territory. According to Olick, if Kearney intended to terminate him in January, he would have followed up after seeing Olick listed as an active agent and would not have continued to make changes to his sales territory in early 2006. Olick therefore argues that his termination was not an inevitable result of the Notice of Intent sent by Kearney, but rather a retaliatory act by Lee for filing a discrimination suit against the Knights.

Lee and Kearney gave contradictory testimony as to the events leading up to Olick's termination on February 28. The court credited Kearney's testimony, however, because whereas Lee's testimony was internally inconsistent, Kearney maintained throughout the litigation and at trial that he intended to terminate Olick in January 2006. The evidence supports Kearney's version of the events as well. Therefore, I find that the bankruptcy court did not make a clearly erroneous finding regarding Kearney's intent to terminate Olick. Moreover, although testimony and evidence at trial establishes confusion regarding the date of termination, Lee and Kearney seemed to be in agreement after the first phone call that Olick was terminated. In fact, although Olick now argues that trial testimony and evidence establishes that Lee terminated him, in his post-trial submissions, Olick stated that the decision to terminate was made by Lee and Kearney jointly. (Doc. 372 "Plaintiff's eply Memorandum" ("Two days after the lawsuit was served upon

them, *Kearney, Lee and O'Keefe* decided to terminate the Plaintiff and to backdate the termination by 120 days.") (emphasis added).)[24]

As the bankruptcy court concluded, the evidence establishes that Kearney intended to terminate Olick prior to the lawsuit. The Notice of Intent was sent in September 2005 stating that Olick's production was unsatisfactory.[25] Olick himself interpreted the Notice of Intent along with Kearney's conduct as indicative of Kearney's intent to terminate him. Olick sent letters to the Knights complaining of Kearney's conduct, stating that his impending termination was apparent. Olick filed for unemployment compensation (although he never received any) and began applying for sales positions with other insurance agencies. The  bankruptcy court conceded that the January 1, 2006 termination notice allegedly sent to the Agency department and lost in the mail is the "weakest link" in the findings because no copy was produced. Even without this link, however, the evidence supports the bankruptcy judge's "firm impression that Olick's termination was inevitable."

I will therefore affirm the bankruptcy court's final judgment.

---

[24]  Furthermore, if Lee and Kearney engaged in a conspiracy to backdate Olick's termination during the first phone call, the subsequent confusion regarding the date of termination would likely have been avoided.

[25]  Again Olick argues that Kearney's conduct in 2005, including the Notice, was creating pretext to terminate his because of age. This claim was disposed of on summary judgment. His conduct is therefore evidence of intent to terminate Olick.